THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* GARY W. ODDY, Appellant, et al., Defendant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* GARY W. ODDY, Defendant, and HARRY L. BARR, Appellant.

Fourth Department, July 2, 1962.

*Louis R. James* and *Philip A. McBride* for Gary W. Oddy, appellant.

*Norman J. Scott* and *Charles R. Newman* for Harry L. Barr, appellant.

*Julian R. Hanley, District Attorney,* for respondent.

GOLDMAN, J. Appellants, 16 years of age, were committed to the Wyoming County Jail upon the charge of grand larceny first degree for the alleged theft of an automobile. While there detained they were the only prisoners lodged on the second floor of the jail. During the month they were there they had sprung the lock on their cell and roamed about on the second floor almost at will when no guards were present. According to their statements, they conceived a plan of escape which

involved the overpowering of the guard who brought them their food. In the carrying out of this plan appellant Oddy attacked the guard, struck and wounded him with his fist, in which he held a coil spring from his bed, and nine days later the guard died. Appellants were indicted for felony murder, in violation of subdivision 2 of section 1044 of the Penal Law, in that while engaged in an attempt to commit the felony of escape from jail, in violation of section 1694 of the Penal Law, they killed the guard. The jury returned a verdict of guilty of murder, first degree, with a recommendation, and both appellants were sentenced to life imprisonment.

There are two reasons why these convictions must be set aside and new trials ordered. The first deals with the selection of an alternate juror who ultimately replaced a juror who became ill, and the second with the refusal of the court to charge lesser degrees than first degree murder.

After the first 12 jurors had been chosen, the attorneys proceeded to select two alternate jurors. One Stockweather, who later replaced the ill juror, was selected as one of the alternates. On the *voir dire* it was revealed that he had been a deputy sheriff for 9 years and a prison guard in Attica State Prison for 30 years. The following took place upon his examination by the District Attorney:

" Q. Do you have any opinion in your mind now as to the guilt or innocence of these Defendants? A. Well — I have some, I think, yes.

" Q. You feel it such as might interfere with your judgment on the case? A. Well, let me explain it this way: I have a nine years deputy sheriff work and I got thirty years in Attica prison. I might be affected. I would try to go by the evidence, to be honest as I could be.

" Q. You feel you do have something in your mind which would require more evidence to reach a decision? A. I am not positively sure.

" Q. We all should be naturally. That doesn't quite answer our problem, Mr. Stockweather. Do you feel that you have such a state of mind that it would require more evidence for you to reach a decision in this case than if that didn't exist in your mind? A. Well, that is the way I feel, yes. I think that I would have to be very sure of the evidence — the evidence would have to be very strong.

" Q That is the only way I can ask you. You feel it would take more evidence to convince you than if it were some other case? A. I would hate to commit myself. As I said, I would

be very honest about it. I would go with the evidence. But I am just a little skeptical — I don't — but — ".

After considerable more examination as to his state of mind he was asked: " Q. That is not the question I am asking. I am speaking about this hesitation in your mind, your doubt. You think there is a possibility at all, is that what you are trying to tell me, in spite of yourself, your background might come into the picture so the net result would be you would require perhaps a little more or possibly a little less evidence than another juror with that background. Is that it? " to which he answered: " A. Well, that could be possible." It is not clear from the record whether or not at this point, appellants' attorneys, who had been assigned to represent them, had exhausted their peremptory challenges to alternate jurors, although one of them upon argument of the appeal stated that there had been such exhaustion and this statement was not contradicted by the District Attorney. The court indicated that they should continue the examination of the juror and stated that " I feel there is not proper cause there ". At this juncture the motion to excuse for cause should have been granted. Ultimately after more questioning Mr. Stockweather stated he would do his best and would do what he felt was right in arriving at a verdict. Finally all of the attorneys indicated that the alternates were satisfactory. The statement of Mr. Justice CLARK in *Irvin* v. *Dowd* (366 U. S. 717, 728) that " No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but the psychological impact requiring such a declaration before one's fellows is often its father. Where so many, so many times, admitted prejudice, such a statement of impartiality can be given little weight," certainly seems pertinent here. Although this prospective juror ultimately declared, perhaps in all good conscience, that he would decide the fate of these appellants on the evidence, the influence he felt and so persistently expressed from his 39 years of experience as a guard should have made it apparent that it would be difficult, if not impossible, as indicated by his answers, for him to fight detachment from his past.

Actual bias is defined by section 376 of the Code of Criminal Procedure as " the existence of a state of mind on the part of the juror, in reference to the case, or to either party, which satisfies the court, in the exercise of a sound discretion, that such juror cannot try the issue impartially and without prejudice to the substantial rights of the party challenging ". In *People* v. *Fernandez* (301 N. Y. 302, 319) it was held that

although jurors might sit if under subdivision 8 of section 377 of the Code of Criminal Procedure they would conscientiously return a verdict of guilty notwithstanding their opinions as to capital punishment they could be excused for "implied bias" under subdivision 2 of section 376 if in the opinion of the court they could not try the issues impartially. As a matter of discretion this prospective juror, in view of his definite statements of partiality and bias, should have been excused. (See *People* v. *Genovese,* 10 N Y 2d 478, 481, 482; *Tumey* v. *Ohio,* 273 U. S. 510, 522.)

The Trial Judge charged that the only possible verdicts the jury could return "are guilty of murder in the first degree; or not guilty of murder in the first degree". Requests were made for a charge as to a lesser crime and particularly to charge manslaughter in the second degree. We believe that the denial so to charge was error. *People* v. *La Marca* (3 N Y 2d 452) involved the kidnapping of a child and his abandonment from which death ensued. The court held that the defendant could not terminate or abandon the kidnapping and thus reduce the gravity of the offense by leaving an infant in a place where there was little likelihood that he would be found alive. Chief Judge CONWAY restated the applicable test at page 464 as follows: "This court has not ruled that every defendant charged with felony murder is entitled to a charge on the lesser degrees of homicide. A defendant may not insist upon such a charge being given unless the evidence spells out some form of common-law homicide." In applying this test we must look to the evidence and in our view of it, it may spell out common-law homicide. Manslaughter in the first degree should have been charged under the proof. Subdivision 2 of section 1050 of the Penal Law defines that felony as homicide "when committed without a design to effect death: * * * 2. In the heat of passion, but in a cruel or unusual manner, or by means of a dangerous weapon." The initial blow struck by appellant Oddy might well have been in furtherance of the felony of attempt to escape. However, when the guard fell to the floor and the commotion was heard by those on the first floor, Oddy again started to beat him in order to silence his outcry. At this point whether the character of the assault changed because his mental state was then aggravated and may have fallen within the requisite "passion" should have been presented to the jury. In any event the question of whether the continued assault was a separate crime or a part of the original felony of attempt to escape, which may well have

been abandoned at that point, was a question of fact for the jury. A further jury question existed as to whether the coil spring used in the way defendants used it was in fact a dangerous weapon. *People* v. *Vollmer* (299 N. Y. 347) holds that fists alone do not constitute a dangerous weapon. In *People* v. *Adamkiewicz* (298 N. Y. 176) an ice pick was held to be dangerous under section 1897 as was a piece of a baseball bat in *People* v. *McPherson* (220 N. Y. 123). Brass knuckles fall per se into the same category under the above section (*People* v. *Mogul,* 204 Misc. 995). Of course a bedspring is not in the same generic category standing apart from its use as the blackjack. The question is one of fact. In *Lenahan* v. *People* (3 Hun 164, 165, affd. *People* v. *Lenahan,* 62 N. Y. 623) it was held that an indictment charging that the defendant '' with a certain piece of lead '' did willfully strike and beat the victim, was sufficient under the applicable statute as were the handle of a pitchfork (*Filkins* v. *People,* 69 N. Y. 101) and a horseshoe (*People* v. *Cavanagh,* 62 How. Pr. 187).

Manslaughter second degree, the '' catchall '' homicide, certainly would apply and should have been charged under the evidence. By defendants' own admissions (confessions) and from the statements of the examining doctors and those who found the guard as to the bruises on his face, it appears that appellant Oddy ran out, struck the guard on the jaw with his left fist and subsequently with his right one which enclosed the bedspring. Appellant Barr, the accomplice, ran out of his cell with a towel in order to prevent the victim's outcry but was unable to do so. Clearly this could be found to be a killing committed without a design to effect death by a person committing a trespass of the person killed, the precise requirements of subdivision 1 of section 1052 of the Penal Law. Also the jury might have found that the killing was done in the heat of passion but not by means of a dangerous weapon. (Penal Law, § 1052, subd. 2.) At least, it was a question which should have been left for the jury's determination.

*People* v. *Schleiman* (197 N. Y. 383, 390) which involved a felony murder committed while the defendant was engaged in the commission of a burglary, states a rule of caution which we think should have been followed in the case at bar: '' The conditions are exceptional, however, which warrant a refusal to instruct the jury as to their power to convict of a lower degree of the crime charged for which the defendant is upon trial and great care should be observed, as was done here, not to withhold such instruction unless the case is one like that

before us, where there was no possible view of the facts which would justify any other verdict except a conviction of the crime charged or an acquittal.''

Perhaps the most significant opinion upon this question is found in *People* v. *Moran* (246 N. Y. 100). The Trial Judge had sent the case to the jury upon the single theory of homicide by one engaged in the commission of the felony of escape after arrest. The Court of Appeals held that if the defendant was trying to escape, then the first asault was over, and a second felonious assault had begun which merged in the succeeding homicide. At pages 102 and 103 Chief Judge CARDOZO stated the applicable rule: '' Cases are found at times where the inculpatory facts are susceptible of one interpretation only: either the one accused was engaged in an independent felony at the time of the killing, or he did not kill at all. In such conditions the law does not say that other forms or grades of homicide shall be submitted to the jury (*People* v. *Schleiman, supra*). If, however, the facts are susceptible of varying interpretations, there must be a submission of whatever forms and grade comport with the proofs and the indictment (*People* v. *Van Norman,* [231 N. Y. 454]; *People* v. *Koerber,* [244 N. Y. 147])." The court reiterated the *Schleiman* rule, stating (p. 105) that a submission of the case on felony murder alone '' is proper only where there is 'no possible view of the facts which would justify any other verdict except a conviction of the crime charged or an acquittal '. * * * Evidence uncertain in its implications must not be warped or strained to force a jury into the dilemma of choosing between death and freedom. We do not say that this jury, with choice unconstrained, would have chosen otherwise than it did. There was ample evidence to justify a verdict of deliberate and premeditated murder if that issue had been submitted. It never was.'' (Also, see *People* v. *Mussenden,* 308 N. Y. 558, 562.)

The suggestion emerges from the *Moran* case that this overriding policy favoring submission of all possible degrees of homicide under the evidence should govern. When the court states its example — either the defendant was guilty of felony murder or did not kill — there seems no alternative but to charge everything from first degree murder on down. However, we do not believe the evidence warrants such a charge in the case at bar. Upon the evidence in this record the court should have charged, in addition to the felony murder, the requisites of manslaughter first and second degrees. Everyone has assumed that the defendants' own stories, as contained in their

statements, should control. There is no requirement that this be so. The jury might have disbelieved them and found that when appellant Oddy commenced to strike the jailer anew, he did so with a changed state of mind. (See *People* v. *Cummings,* 274 N. Y. 336, 338, 339; *People* v. *Lunse,* 278 N. Y. 303.)

The denial of the challenge for cause of the alternate juror, in and of itself, requires a new trial. Depending upon the evidence presented, it is difficult to determine at this stage what lesser degrees of crime should be charged upon the new trial. As indicated above, if no different evidence is offered than appears in the record before us, the court should charge the law in reference to manslaughter first and second degrees.

The judgments of conviction should be reversed and a new trial granted.

HALPERN, J. (dissenting). I do not believe that either of the grounds given in the majority opinion justifies a reversal of the judgments of conviction in this case.

1. The trial court's failure to excuse Stockweather for cause is not, in my opinion, a proper ground for reversal. After Stockweather had given the answers quoted in the majority opinion and after the counsel for one of the defendants had asked that he be excused for cause, the District Attorney put the following questions and elicited the following responses:

" Q. Would you decide the case entirely on the evidence you hear in the courtroom? A. Yes, sir; I would.

" Q. You would disregard anything that is in your mind? A. Yes."

Thereupon, the court stated " You may continue your examination. In view of the last statement, I feel there is not proper cause there." The examination of Stockweather by the attorneys for the defendants continued for some time thereafter, and after the District Attorney had announced that the alternate jurors were satisfactory to him, upon the completion of the examination, the court asked the defendants' attorneys: " Does the defense wish to challenge? " The attorneys for the defendants thereupon separately stated that the alternates were satisfactory to them.

It does not appear from the record that the defendants had exhausted their peremptory challenges at that time. The Clerk's minutes do not differentiate between challenges used in the selection of the first 12 jurors and those used in the selection of the alternate jurors. The minutes show that the defendants used only 28 peremptory challenges in all despite the fact that

they had 30 peremptory challenges in the selection of the original jury and 6 challenges for the selection of the two alternates. The question put by the court upon the completion of the examination of Stockweather would seem to indicate that the defendants still had unused peremptory challenges. In any event, the question was broad enough to include both peremptory challenges and challenges for cause. The court's question was an invitation to the defendants' attorneys to request the excuse of Stockweather for cause, if in the light of his whole examination, they thought that a ground for challenge for cause existed. The defendants' attorneys chose not to challenge Stockweather either for cause or peremptorily; instead, they affirmatively stated that the alternate jurors were satisfactory.

As a matter of fact, the defendants do not assert in their briefs upon this appeal that the failure to excuse Stockweather for cause was erroneous. Only one of the briefs mentions Stockweather and it does this only obliquely in arguing that it was error for the court summarily to excuse one Root, a member of the original jury, who became ill and was replaced by Stockweather just before the case was submitted to the jury. The argument is made that it was error to excuse Root and that the error prejudiced the defendants because Root was replaced by an alternate who was less favorable from their point of view than Root. This argument is not mentioned in the majority opinion; presumably, it was rejected by the majority of the court. But out of this argument, the majority has constructed a new claim of prejudicial error which was not advanced in the briefs of either defendant. I think that the trial court would have been right in refusing to excuse Stockweather for cause in the light of his whole examination, if a request for such an excuse had been made but, in any event, no such request was made upon the completion of Stockweather's examination and the point is not available to the defendants upon this appeal.

2. The refusal of the trial court to charge lower degrees of homicide, was, in my opinion, correct. I believe that the rule which emerges from the cases on this subject, insofar as they are applicable to this case, is this: If, in the judgment of the trial court, there was no reasonable basis in the evidence for a finding that the acts causing the death of the decedent occurred otherwise than in the course of the commission of a felony, the court should submit the case to the jury as calling either for a conviction of a felony murder or an acquittal (*People* v. *Stevens,* 272 N. Y. 373; *People* v. *Lunse,* 278 N. Y. 303; *People*

v. *Flakes,* 7 N Y 2d 1038). The crucial question is not whether there was evidence in the case from which it could be found that the defendant had committed acts which could constitute a lower degree of homicide but whether there was evidence in the case which justified a finding that those acts had not occurred in the course of a commission of a felony. The only hypothesis suggested in the majority opinion upon the basis of which it could be found that the assault upon the decedent was not committed in the course of a felony, is that the attempt to escape " may well have been abandoned " prior to the striking of the second blow. This hypothesis has no basis whatever in the evidence. Indeed, no claim was advanced by the defendants' counsel at any time during the course of the trial that it might be found that the felony had been abandoned and no request was made that the court submit any such issue to the jury. Neither is there any suggestion of the abandonment theory in either of the briefs of the defendants upon this appeal. A reading of the record demonstrates to a point of moral certainty that the blows were struck in a single, continuous assault, for the purpose of effectuating the defendants' escape. They were an integral part of the commission of the felony of attempting to escape from prison.

It is true that the jury would have had the arbitrary power to find an abandonment, contrary to the evidence, if that issue had been submitted to it. Every factual claim raised by a defendant has to be submitted to the jury as a question of fact even though the evidence is so overwhelming against the defendant's contention that in a civil case involving a similar issue, the issue would have been disposed of as a matter of law. But in determining whether to charge lower degrees of homicide, the court must decide for itself whether there is any basis in the evidence for the defendant's contention. In our case, even if the question of abandonment had been raised at the trial, the court's decision would necessarily have been that there was no basis in the evidence for finding that the felony had been abandoned before the assault was committed.

The existence of the arbitrary power of the jury to make a finding in favor of the defendant contrary to the evidence does not require or authorize the court to charge lower degrees of homicide. The lower degrees of homicide may be charged only in a case in which a finding by the jury that the felony was not in progress would have a reasonable basis in the evidence and would not be an arbitrary exercise of naked power. (*People* v. *Mussenden,* 308 N. Y. 558.) While the *Mussenden* case was

not a felony murder case, the analysis by Judge FULD in that case, is directly applicable to felony murder cases. Judge FULD took account of the arbitrary power of the jury (p. 563) " to refuse to find any fact regardless of how clearly it may appear to a judge to have been proved" and he continued " There is probably no way to prevent or guard against this, but certainly a court should avoid doing anything, such as submitting lower crimes in an inappropriate case, that would constitute an invitation to the jury to forswear its duty and return a compromise or otherwise unwarranted verdict * * *. The principle has, accordingly, evolved that the submission of a lesser degree or an included crime is justified only where there is some basis in the evidence for finding the accused innocent of the higher crime, and yet guilty of the lower one ". The determination of whether " there is some basis in the evidence " for the finding must be made by the court, for the purpose of deciding whether to submit lower degrees of crime. This may seem paradoxical since, as has been pointed out above, the jury would still be free to find that a felony had not been in progress, at the time of the fatal assault, even though there was no reasonable basis in the evidence for such a finding. But in that situation, the jury should be required to face up to the issue of convicting of felony murder or acquitting the defendant entirely; it should not be given the easy way out of convicting the defendant of a lower degree of homicide. As Judge FULD explained (p. 562) in the *Mussenden* case, this paradoxical situation is " an inevitable consequence of the jury system " and of " the jury's power to dispense mercy ", (p. 563) or, for any other reason, to find in favor of the defendant " despite the evidence " (p. 563). But the power of the jury to make finding in favor of the defendant, contrary to the evidence, in a criminal case cannot be allowed to determine the propriety of the submission to the jury of lower degrees of crime.

In the situation presented in this case, the court acted properly in refusing to submit to the jury any lower degree of homicide.

I therefore vote to affirm the judgments of conviction.

WILLIAMS, P. J., BASTOW and HENRY, JJ., concur with GOLDMAN, J.; HALPERN, J., dissents and votes to affirm in opinion.

Judgments of conviction reversed on the law and facts and in the interest of justice, and a new trial granted.