STATE OF CONNECTICUT *v.* ADRIEN M. MORIN

COTTER, C. J., LOISELLE, BOGDANSKI, PETERS and HEALEY, Js.

600

Argued November 8, 1979—decision released May 20, 1980

*John K. Harris, Jr.,* special public defender, for the appellant (defendant).

*Robert E. Beach,* assistant state's attorney, with whom was *Harry S. Gaucher, Jr.,* state's attorney, for the appellee (state).

LOISELLE, J. The defendant was tried by a jury of twelve upon an indictment charging him with felony murder. The jury returned a verdict of guilty. The defendant appealed from the judgment rendered on the verdict. The sole issue raised by the defendant is whether the trial court erred in refusing to instruct the jury on burglary in the first degree; General Statutes § 53a-101 (a) (2);[1] and robbery in the first degree; General Statutes

---

[1] "[General Statutes] Sec. 53a-101. BURGLARY IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of burglary in the first degree when he enters or remains unlawfully in a building with intent to commit a crime therein and: (1) He is armed with explosives or a deadly weapon or dangerous instrument, or (2) in the course of committing the offense, he intentionally, knowingly or recklessly inflicts or attempts to inflict bodily injury on anyone."

§ 53a-134 (a) (1);[2] as lesser offenses included in the indictment charging felony murder. General Statutes § 53a-54c.[3]

"A defendant is entitled to an instruction on a lesser offense if, and only if, the following conditions are met: (1) an appropriate instruction is requested by either the state or the defendant; (2) it is not possible to commit the greater offense, in the manner described in the information or bill of particulars, without having first committed the lesser; (3) there is some evidence, introduced by either the state or the defendant, or by a combination of their proofs, which justifies conviction of the lesser offense; and (4) the proof on the element or elements which differentiate the lesser offense from the offense charged is sufficiently in dispute to permit the jury consistently to find the defendant innocent of the greater offense but guilty of the lesser." . *State* v. *Whistnant,* 179 Conn. 576, 588, 427 A.2d 414

---

[2] "[General Statutes] Sec. 53a-134. ROBBERY IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime: (1) Causes serious physical injury to any person who is not a participant in the crime . . . ."

The crime of robbery is defined as follows: "[General Statutes] Sec. 53a-133. ROBBERY DEFINED. A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny."

[3] "[General Statutes] Sec. 53a-54c. FELONY MURDER. A person is guilty of murder when acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary . . . and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants . . . ."

(1980). The record shows that the state requested an instruction to the jury on burglary and robbery as lesser included crimes[4] and that the defendant supported that request. The grand jury's indictment alleged "that at the City of Willimantic, in Windham County, on or about the 21st day of August, 1975, the said Adrien M. Morin, acting with two other persons, did commit a burglary and robbery, and in the course of and in furtherance of such crimes, said Adrien M. Morin caused the death of a person other than one of the participants, namely, the death of one Dominic Dipollina, late of 240 Walnut Street, in Willimantic, in violation of the provisions of § 53a-54c of the General Statutes of Connecticut." The state's request for an instruction on the lesser crimes and the terms of the indictment satisfy the first two criteria of the test established in *State* v. *Whistnant,* supra.

The third requirement of the rule is that there be some evidence which would justify conviction of the lesser offenses which were alleged in the indictment and for which instructions were requested. To make this determination it is necessary to review the evidence presented. Shortly after 11 p.m. on August 21, 1975, the Willimantic police department sent a police sergeant to 240 Walnut Street to investigate a possible burglary in progress. The sergeant met two other police officers at the scene upon his arrival. He noticed a light on in the basement. The sergeant and a neighbor entered the house through the front door which was slightly ajar and walked through the house to the den. There they found

---

[4] The parties' requests for an instruction on first degree burglary and robbery is more accurately characterized as a mutual acknowledgment that the allegations of the indictment supported a charge on those crimes as lesser included offenses under *State* v. *Brown,* 163 Conn. 52, 61–62, 301 A.2d 547 (1972).

eighty-year-old Dominic Dipollina clothed in shorts and a T-shirt lying on his back on the floor. His legs were bloody, there was blood around his head, and he appeared to be in shock. They called an ambulance and one of the officers performed first aid.

An investigation showed that an upstairs window, which was intact earlier in the day, had been broken from the outside. Several neighbors had heard the sound of breaking glass at about 11 p.m. that evening. A palm print "lifted" from the window was subsequently identified as that of Adrien Morin. Several witnesses also saw three people run from the house shortly after 11 p.m., one of whom ran with a limp. A neighbor saw the three get into a maroon Chevrolet and drive away with the lights off. Adrien Morin ran with a limp and, at that time, the defendant's brother Ronald Morin drove a 1965 maroon Chevrolet.

The details of the crime were supplied by Ronald Morin, the defendant's brother, who testified under a grant of immunity. Ronald and another brother Lionel had painted Dipollina's house together in the summer of 1973. Their sister, Jeannine Baril, lived next door to Dipollina at 238 Walnut Street. In August, 1975, several days before the crime, Ronald and Adrien visited Jeannine at her house. When Adrien suggested that they go next door to "see if the old man has anything," Jeannine objected. Adrien told her not to get in his way. Ronald apparently broke up the confrontation.

On August 21, 1975, the night of the crime, Ronald, Adrien and an unnamed third party drove to Jeannine's house. On the way there, Adrien said he wanted to rob Dipollina. Ronald parked the car

around the corner and went to Jeannine's house while Adrien went to Dipollina's house and looked in a window. Upon hearing a window break, Ronald went to the Dipollina home, entered through the front door and found Adrien grasping Dipollina by his shirt. Adrien pushed Dipollina onto a couch, took a wallet from his pocket and took money from another wallet. Ronald testified that he tried to convince Adrien to leave. Shortly thereafter, Ronald and the unnamed third party went to the basement to take beer, leaving Adrien alone upstairs with Dipollina. Ronald heard Dipollina cry out and implore Adrien to let him alone. When Ronald came back upstairs, Dipollina was unconscious but breathing. The three ran from the house and fled in the car with the $180 taken from one of the wallets.

This evidence was offered by the state. The defendant presented no evidence. The state's evidence justified a conviction for first degree burglary,[5] first degree robbery,[6] or both. *State* v. *Rado,* 172 Conn. 74, 75–77, 372 A.2d 159 (1976), cert. denied, 430 U.S. 918, 97 S. Ct. 1335, 51 L. Ed. 2d 598 (1977). The defendant has therefore established the third criterion of *State* v. *Whistnant,* supra.

With regard to the fourth and final criterion of *State* v. *Whistnant,* it is necessary to determine which elements differentiate first degree burglary and first degree robbery from felony murder, then to consider whether those elements were sufficiently in dispute to permit the jury consistently to find the defendant innocent of felony murder but guilty of burglary or robbery. General Statutes § 53a-54c which proscribes felony murder provides in per-

[5] See footnote 1, supra.

[6] See footnote 2, supra.

tinent part: "A person is guilty of murder when acting either alone or with one or more persons, he commits . . . robbery [or] burglary . . . and, in the course of and in furtherance of such crime . . . he . . . causes the death of a person other than one of the participants . . . ."[7] Since the definition of felony murder includes the crimes of robbery and burglary by name, the only pertinent elements of felony murder which remain to differentiate these lesser offenses from felony murder are encompassed by the words ". . . in the course of and in furtherance of such crime . . . he . . . causes the death of a person other than one of the participants . . . ."

The evidence reviewed above was uncontradicted by the defendant. There was no dispute at trial that Dipollina's injuries were inflicted in the course of and in furtherance of the crime. The only differentiating element which may have been in dispute, and then solely by virtue of cross-examination, was the cause of death. The evidence showed that Dipollina was beaten on August 21, 1975, but did not die until December 24, 1975. The state introduced witnesses to prove that the beating was the cause of death approximately four months later. One of Dipollina's daughters testified that before August 21, 1975, her father, though eighty years old, enjoyed a fairly vigorous life. He cared for his home, mowed his lawn, gardened, chopped wood, shoveled his driveway, and drove his truck every day to go shopping. She had visited her father on the day of the crime and he was well. At around midnight that evening she was called to the emergency room where she saw her father on a stretcher. He was just staring

---

[7] Although the statute provides an affirmative defense, it was not asserted by the defendant in this case and is not in issue on the appeal.

and didn't talk. The next day she returned to the hospital. Her father was dazed and in shock. His neck was purple, his lip stitched, his nose broken, and his arm discolored. One of his eyes was swollen almost shut. His daughter took him to her home. Upon his release from the hospital, Dipollina alternated between living at the houses of his two daughters. He had difficulty eating and sleeping and was afraid to be left alone. He was hospitalized again for three days after complaining that he could not swallow, then again returned to live with his daughters. On September 15, 1975, he was transferred to a convalescent home where he did not want to eat, became incoherent and had to be harnessed. Throughout this period he had difficulty swallowing and pains in his head. He was transferred to the hospital on October 7, 1975, where he died on December 24, 1975.

The state also called five physicians to testify to the cause of Dipollina's death. The doctor who treated him in the emergency room on the night of the crime testified that Dipollina had received more than one blow to the head, neck and arms, sustaining fractures in the nose and abrasions, lacerations and contusions on the neck, lip and forearms. His family doctor, whom he had been seeing for the past twelve years, testified that Dipollina's daughter had telephoned him two days after the crime and said that her father was experiencing a great deal of pain. Upon examination, the doctor determined that swelling in his neck prohibited Dipollina from eating and readmitted him to the hospital to check for further internal injuries. The family physician also testified that on September 15, 1975, Dipollina was admitted to a convalescent home where he became increasingly frightened, agitated, aggres-

sive, belligerent and unaware of what he was doing. His mental condition deteriorated. He had to be physically restrained on October 2, 1975, and gradually became semicomatose. He developed pneumonia and a cerebral hemorrhage. On October 7, 1975, he was transferred to the hospital where he was fed intravenously when he refused to eat. He ingested less and less fluid, resulting in more hemorrhaging. He was unconscious for the last several weeks of his life. This physician attributed Dipollina's steadily deteriorating condition to the injuries sustained on August 21, 1975.

The third physician called by the state was the assistant medical examiner who completed the death certificate and ordered that an autopsy be performed. He classified the cause of death as "homicidal assault."[8] On cross-examination, he testified that the specific cause of death was subdural hemorrhaging and clotting, which, in Dipollina's case, included old and new bleeding covering both sides of the brain. He also testified that subdural hemorrhages are almost always caused by trauma, that he had never seen one caused by anything else, and that symptoms of subdural hemorrhage may not appear for many weeks after a traumatic event.

The state also called as a witness the pathologist who performed the autopsy on the date of Dipollina's death. He found that death was caused by "chronic subdural hematoma," a chronic hematoma being one which is not apparent immediately after the injury and may not be recognized for months. The physician testified that chronic hematomas are

---

[8] The witness testified that the death certificate required him to classify the death as an accident, a suicide, a homicide, undetermined or due to natural causes.

most frequently caused by trauma and characterized by slow bleeding. Symptoms include personality change and headaches. This physician testified that the hematoma which caused Dipollina's death had existed for three to six months, and could not have been caused by the fall from his hospital bed on December 7, 1975. He said that the autopsy also revealed pneumonia, malnutrition and muscle wasting. In answer to a hypothetical question assimilating the facts, the doctor concluded that the only explanation for the cause of death was the injuries sustained August 21, 1975, which caused the hematoma which in turn caused death. On cross-examination, the doctor's conclusion was refined to a statement that the hematoma may not have been the sole cause of death but was, in this case, the "earliest insighting [sic] cause."

Finally the state called the chief medical examiner for the state of Connecticut who discussed the circumstances of death and the findings of the autopsy with the doctor who had performed it. In answer to a hypothetical question which contained much of the evidence presented, the doctor concluded that the August 21 injuries were "the precipitating cause of death."

The defendant introduced no expert or direct evidence to contradict the testimony of the five doctors called by the state. The few statements cited by the dissenting opinion from cross-examination of the state's five expert witnesses can hardly be considered a "strong attack" on the state's evidence that the defendant caused Dipollina's death. The evidence most favorable to the defendant was adduced on cross-examination of the pathologist who per-

formed the autopsy and of the chief medical examiner. These witnesses agreed that the injuries sustained by Dipollina on August 21, 1975, were not the "sole proximate cause of death" but were, according to the pathologist, a major cause of terminal illness and death, and according to the medical examiner, the precipitating cause of death. Therefore, even when viewed in a light most favorable to the defendant, the testimony of the medical experts supports the jury's conclusion that the August 21, 1975 beating set in motion the force which killed Dominic Dipollina on December 24, 1975. *Washington* v. *State,* 171 Conn. 683, 687, 372 A.2d 106 (1976). It cannot be said that the element of causation was sufficiently in dispute to permit the jury consistently to find the defendant innocent of felony murder but guilty of first degree burglary or robbery. *State* v. *Whistnant,* supra. Nor can it be said that this court's decision in *State* v. *Whistnant,* rendered during the pendency of this appeal, has worked injustice on the defendant. The only criterion of *Whistnant* which remains unsatisfied on appeal turns on the issue of causation, which was also the only issue remotely in dispute at trial. The record shows that the parties had ample opportunity to address the issue of what caused the victim's death. The trial court did not err in refusing to submit first degree burglary and first degree robbery to the jury as lesser included offenses.

"It is axiomatic that the state, in a criminal case, has the burden of proving every essential element of the crime charged beyond a reasonable doubt. *State* v. *DeCoster,* 147 Conn. 502, 504, 162 A.2d 704; *State* v. *Newman,* 127 Conn. 398, 400, 17 A.2d 774." *State* v. *Jackson,* 176 Conn. 257, 258, 407 A.2d 948 (1978). Here, the facts which the jury could have

found from the state's evidence were sufficient to prove each and every element of felony murder, including causation, and therefore sufficient to sustain the verdict. *State* v. *Jackson,* supra, 262.

There is no error.

In this opinion COTTER, C. J., BOGDANSKI and PETERS, Js., concurred.

ARTHUR H. HEALEY, J. (dissenting). I cannot agree with the majority's opinion that the element of causation, which differentiates the greater offense of felony murder from the lesser offenses of first degree burglary and first degree robbery, was not "sufficiently in dispute" to permit the jury consistently to find the defendant innocent of felony murder but guilty of burglary or robbery. Although the majority acknowledges that "[t]he state's evidence justified a conviction for first degree burglary, first degree robbery, or both," it goes on to hold that the defendant was not entitled to instructions on those offenses on the basis of the last prong of the test in *State* v. *Whistnant,* 179 Conn. 576, 427 A.2d 414 (1980). The majority's statements that the evidence "supports the jury's conclusion that the August 21, 1975 beating set in motion the force which killed Dominic Dipollina on December 24, 1975," and that "the facts which the jury could have found from the state's evidence were sufficient to prove each and every element of felony murder, including causation, and therefore sufficient to sustain the verdict," serve to obscure the issue on this appeal. The question of the sufficiency of the evidence to sustain the verdict has not been raised by anyone. The only question is whether the evidence on the element of causation was "sufficiently in dispute to permit the jury consistently to find the

defendant innocent of the greater offense but guilty of the lesser." *State* v. *Whistnant,* 179 Conn. 576, 588, 427 A.2d 414 (1980). I believe that this last condition of *Whistnant* means that where reasonable minds could differ upon the existence or nonexistence of the element(s) that distinguishes the greater from the lesser offense, the defendant or the state is entitled to an instruction upon it. Cf. *State* v. *Gosselin,* 169 Conn. 377, 379, 363 A.2d 100 (1975). This is so because the defendant is entitled to have the jury pass upon every factual issue fairly presented by the evidence. See *Keeble* v. *United States,* 412 U.S. 205, 212–13, 93 S. Ct. 1993, 36 L. Ed. 2d 844 (1973); *State* v. *Rodriguez,* 180 Conn. 382, 385, 429 A.2d 919 (1980).

This case presents a classic example of the last prong of *Whistnant* being satisfied, for not only could reasonable minds differ on the element of causation, but there was an actual dispute at the trial on this point. What I consider to be a strong attack made by the defendant on the state's case on the element of causation is not entirely evident from the facts appearing in the majority opinion, which derive primarily from the evidence summarized in the state's brief. I believe that this is a case where it is necessary to deviate from our normal procedure of examining only the evidence in the briefs; see Practice Book, 1978, § 3060R; and, under § 3060R "consult the transcript of evidence on file to supplement or explain the evidence" in the briefs because "sufficient cause appears" to do so. When the defendant filed his brief, our decision in *State* v. *Whistnant,* supra, had not been published and he was, therefore, unaware of any need to satisfy the requirements set out in that case. He relied upon the state of the law at the time his brief was filed,

according to which, it may fairly be assumed, his claim that he was entitled to an instruction on the lesser included offenses involved would have had substantial merit. See *State* v. *Vasquez,* 176 Conn. 239, 241, 405 A.2d 662 (1978).[1] Inasmuch as we now require the defendant to satisfy a requirement of the *Whistnant* test that he was unaware of at the time the appeal was heard, I believe that sufficient cause exists to examine the evidence presented notwithstanding the defendant's failure to print a summary of that evidence in his brief. See Practice Book, 1978, § 3164.

In this case the state called five doctors to testify. The testimony of four of these doctors was directed to a single issue: the cause of the victim's death.[2] Each of these doctors was subjected to extensive cross-examination on that issue. Doctor Swan is a general practitioner in family practice. He testified that he saw the victim on July 10, 1975, just prior to the assault of August 21, 1975, for complaints which included a urinary problem and "poor appetite" and that at the time of a visit one week later he "was apparently healthy." Swan also treated the victim after the assault. The state's attorney

[1] In *State* v. *Vasquez,* 176 Conn. 239, 405 A.2d 662 (1978), we said: " 'The test for determining whether one violation is a lesser included offense in another violation is whether it is possible to commit the greater offense, in the manner described in the information or bill of particulars, without having first committed the lesser. If it is possible, then the lesser violation is not an included crime.' " *State* v. *Vasquez,* supra, 241. The test for determining whether a person is entitled to an instruction on a lesser included offense has been enlarged by our decision in *State* v. *Whistnant,* 179 Conn. 576, 427 A.2d 414 (1980).

[2] Dr. Guy Berry, who examined and treated the victim at the hospital emergency room on the evening of August 21, 1975, and morning of August 22, 1975, had no further contact with him after 9 a.m. on August 22, 1975.

asked him whether the injuries he received in the beating contributed to his death. He answered: "Well, I can say that this definitely had something to do with it. It explains why his condition become (sic) downhill. He was unable to eat. He had sustained multiple injuries, and he lapses (sic) into mental deterioration." During cross-examination, Swan testified that there were occasions, after Dipollina returned to the hospital some time after the August 21 beating, that he tried to get out of bed without assistance, and that on one occasion he fell on the floor and "apparently nobody [saw] how he fell." He also testified on cross-examination that the victim was nourished by the insertion into his stomach of a nasal gastric tube, that he would pull out this tube, and that the family decided not to have the tube reinserted because "their father [was] terminal [and] it was decided not to lengthen the suffering . . . ." Finally, defense counsel asked Swan: "Can you tell us what caused this man's death?" His answer was "No."

Doctor Basden, a general practitioner and assistant medical examiner, viewed the body of the victim and the results of the autopsy in order to fill out the death certificate. Basden concluded that the cause of death was "[b]ilateral organized subdural hematoma with bilateral lobular pneumonia," and he classified this death, under the categories appearing in the certificate, as a "Homicide assault." On cross-examination, Basden testified that he had seen the victim once after the August 21 injury; that the victim's daughter is a neighbor of his; and that he paid the victim a courtesy visit and referred him to his original physician. He also testified that prior to making out the death certificate he had looked at the hospital chart which referred to the August 21

injuries, and spoke to the chief medical examiner. Basden was asked by defense counsel, "What was it about your examination of the body or anything that you observed directly that indicated the origin of this subdural hematoma?" He responded: "The information I had was the original assault," which came from "the chart at the hospital." He also acknowledged on cross-examination that there can be other factors, besides traumatic injury, that cause a subdural hematoma, and that a fatal subdural hematoma was not an injury commonly encountered by a general practitioner, like himself.

Doctor Rosenberg, the pathologist who performed the autopsy, testified that in the examination of the brain his principal finding from the autopsy was a chronic subdural hematoma. He also testified that chronic malnutrition was "an important contributing factor" in the cause of death. On cross-examination he testified that, according to the facts presented to him in a lengthy hypothetical question posed to him by the state on direct examination, the subdural hematoma "would appear to be the earliest insighting [sic] cause or contributing factor." He then went on to say that there were other contributing factors in this death, and was asked the question, "You are not prepared to say that this man's death was solely caused by the subdural hematoma?" He answered "No." He was then asked the following questions and gave the following answers: "Can a subdural hematoma ever be the sole proximate cause of death? A: Yes. It can. Q: But it was not in this situation? A: Not in my opinion."

Doctor Gross, the chief medical examiner for the state of Connecticut, also testified for the state. He

stated on direct examination in response to a hypothetical question that injuries such as those sustained by Dipollina, would be "a contributory cause" of death. Gross, who did not perform the autopsy and never saw the body, consulted with Basden concerning the autopsy. He talked with Basden and "suggested as to how that death certificate should be worded after he [Basden] had outlined to me the circumstances of the death and the autopsy finding." He did not see the autopsy report until after he had spoken to Basden. He testified, on cross-examination, that he was not prepared to say that the subdural hematoma was the sole and proximate cause of death. Nor could Gross state with "reasonable medical certainty" that the subdural hematoma occurred as a result of the injuries inflicted four months earlier. Instead, he testified: "It is possible that it may have, but I can't with reasonable certainty say that."

In the light of this evidence, coupled with the fact that the victim was eighty years of age at the time of the assault and that about four months elapsed between the assault and his death, it is eminently fair to say that a genuine factual dispute existed on the element of causation. Because the evidence showing that the defendant was guilty of burglary or robbery was overwhelming,[3] the element of causation was, in effect, the sole issue in dispute at the trial. The state, as well as the defendant, acknowledged this dispute and the real possibility that the jury might not believe that the element of causation

---

[3] The defendant's brother, Ronald Morin, who was involved in the criminal activity in this case and who was present with the defendant in Dipollina's home on August 21, 1975, testified for the state, under a grant of immunity, concerning the events of that day.

had been proved beyond a reasonable doubt when it requested an instruction on the lesser included offenses of burglary and robbery.[4]

The majority appears to suggest that an element differentiating a greater offense from a lesser offense can be "sufficiently in dispute to permit the jury consistently to find the defendant innocent of the greater offense but guilty of the lesser" only when the defendant presents evidence to rebut the state's evidence on that element. That requirement is not part of the *Whistnant* rule. This is implicitly recognized by the third prong of the *Whistnant* rule, which requires that there be "some evidence, introduced by either the state or the defendant, or by a combination of their proofs, which justifies conviction of the lesser offense." *State* v. *Whistnant,* 179 Conn. 576, 588, 427 A.2d 414 (1980). The function of cross-examination is to put certain matters in dispute and, indeed, in this instance that function is well demonstrated. Nor does such a requirement square with the basic rule that it is the jury's province to decide questions of fact fairly presented by the evidence. See *Stevenson* v. *United States,* 162 U.S. 313, 314, 16 S. Ct. 839, 40 L. Ed. 980 (1896); *State* v. *Rodriguez,* 180 Conn. 382, 405, 429 A.2d 919 (1980). Implicit in the right to trial by jury afforded criminal defendants under the sixth amendment to the United States constitu-

---

[4] While it is true that the appropriate inquiry for the jury is whether the injury inflicted was a "contributory cause" of death; *State* v. *Tomassi,* 137 Conn. 113, 119, 75 A.2d 67 (1950); *State* v. *Leopold,* 110 Conn. 55, 61–62, 147 A. 118 (1929); the question before us is not whether the jury, on the evidence presented, was entitled to conclude that the element of causation was proved. The question is whether under *State* v. *Whistnant,* 179 Conn. 576, 427 A.2d 414 (1980), the defendant was entitled to have the jury consider the lesser offenses involved.

tion is the right to have the jury decide all relevant issues of fact. *United States* v. *Hayward,* 420 F.2d 142, 144 (D.C. Cir. 1969). It is not enough to say the jury fulfills its function of deciding issues of fact simply because in a case such as this they can acquit where an element of the crime charged is not proved beyond a reasonable doubt. The United States Supreme Court has said in this regard: "Where one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of *some* offense, the jury is likely to resolve its doubts in favor of conviction." *Keeble* v. *United States,* 412 U.S. 205, 212–13, 93 S. Ct. 1993, 36 L. Ed. 2d 844 (1973). In *Keeble,* as in the case before us, the jury had to choose between conviction of the offense charged and acquittal, as the trial court refused to charge on a lesser included offense supported by the evidence.[5] The Supreme Court reversed the conviction in *Keeble* and, in doing so, said: "We cannot say that the availability of a third option—convicting the defendant of [the lesser offense]—could not have resulted in a different verdict." *Keeble* v. *United States,* supra, 213. The same can be said here.

In *State* v. *Whistnant,* 179 Conn. 576, 427 A.2d 414 (1980), the fourth prong of the test there announced was appropriately applied. *Whistnant* sought a charge on larceny in the fourth degree as a lesser offense of robbery in the first degree. Because larceny in the fourth degree does not involve use of a deadly weapon or dangerous instrument and the only evidence introduced was of a theft of money by the use of a firearm, we concluded

---

[5] As the majority points out, the state's evidence in this case justified a conviction for first degree robbery, first degree burglary or both.

that the defendant was not entitled to an instruction on the lesser offense. That is hardly the case here. While Whistnant never challenged the use of a gun in the robbery that he was charged with; id., 587; the defendant here strenuously challenged the state's evidence on the element of causation.

In *People* v. *Moran,* 246 N.Y. 100, 158 N.E. 35 (1927), the New York Court of Appeals considered the propriety of a trial court's refusal to charge on a lesser offense of felony murder, which was punishable by death. The *Moran* court concluded that submission of the case to the jury on felony murder alone "is proper only where there is 'no possible view of the facts which would justify any other verdict except a conviction of the crime charged or an acquittal.'" Id., 105. The court went on to state that where evidence is uncertain in its implications the jury must not be forced into the dilemma of choosing between conviction of the crime charged and acquittal. Ibid.; accord, *People* v. *Oddy,* 16 App. Div. 2d 585, 229 N.Y.S.2d 983 (1962). That same reasoning applies here. I believe that under *State* v. *Whistnant,* the defendant was entitled to have the jury pass upon the lesser offenses of first degree robbery and first degree burglary. The element of causation presented a factual question that was not only "sufficiently" in dispute, but was hotly in dispute. Accordingly, I would set aside the judgment and order a new trial.