STATE OF CONNECTICUT *v.* LARRY TINSLEY

COTTER, C. J., LOISELLE, BOGDANSKI, PETERS and HEALEY, Js.

---

Argued April 1—decision released July 1, 1980

*Francis T. Mandanici,* assistant public defender, with whom, on the brief, were *Jerrold H. Barnett,* public defender, and *Herbert J. Bundock,* public defender, for the appellant (defendant).

*Richard L. Shiffrin,* assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's attorney, and *Jonathan C. Benedict,* assistant state's attorney, for the appellee (state).

LOISELLE, J. The defendant was convicted by a jury of robbery in the first degree in violation of General Statutes § 53a-134 (a) (2),[1] and of carrying a pistol without a permit in violation of General Statutes § 29-35.[2] The defendant appealed from the judgment rendered claiming error in four respects.

The evidence presented and relied on by the parties in support of their claims is as follows: On the night of November 19, 1977, Hector Diaz, Graylan Bartley and Dwayne Bennett, all of whom were sailors home on a weekend pass, went to a party at the Pequonnock Apartments in Bridgeport. Upon their arrival, they remained with other people outside the basement room where the party was being held. A man approached Diaz and demanded his gloves. Diaz gave them to him. He then demanded Diaz' sunglasses. When Diaz responded that they

---

[1] General Statutes § 53a-134 provides in pertinent part: "ROBBERY IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime . . . (2) is armed with a deadly weapon . . . except that in any prosecution under this subdivision, it is an affirmative defense that such pistol, revolver, rifle, shotgun, machine gun or other firearm was not a weapon from which a shot could be discharged. Nothing contained in this subdivision shall constitute a defense to a prosecution for, or preclude a conviction of, robbery in the second degree, robbery in the third degree or any other crime."

[2] See footnote 7, infra.

belonged to Bartley, the man proceeded to discuss the matter with Bartley, while the man's two companions escorted Diaz around the corner of the building and relieved him of his change, watch and ring. When the companions had fled and Diaz returned, he saw the man still talking to Bartley and holding Bartley by the arm.

The man then told Diaz and Bartley to walk to an area inside the building by the elevator, where he pulled out a .22 caliber pistol, cocked it and held it to Bartley's head. With Diaz watching from about a foot away, the man shouted that he would "blow [Bartley's] ——— head off," and then put the gun back in his trousers or somewhere behind him, a place later described as "in the back of his trousers or his pocket." He then permitted Bartley and Bennett to leave. Less than a minute later, he demanded Diaz' money. When Diaz responded that he had already relinquished it to the man's companions, the man demanded Diaz' coat and sweater. Finding nothing of value in the pockets of these items he dropped them. He then searched Diaz for a wallet. When he found it, he removed twenty-nine dollars and gave Diaz his wallet back. Diaz then left and met Bartley and Bennett on the street. The whole incident, from the time the man took Diaz' gloves to the time Diaz rejoined his friends on the street, lasted approximately forty minutes.

The remaining evidence summarized by the parties in their statements of fact concerns Diaz' identification of the defendant as the man who took his money and the currency found in the defendant's possession when he was arrested. Throughcut the time in question, Diaz was wearing sunglasses. The

lighting in the area of the building where the money was taken was "not as good as in the courtroom." One of the police officers who arrived at the scene to investigate the incident testified that the defendant told him that the perpetrator was a black male, 5' 5" to 5' 7" tall, wearing white pants, a dark suede jacket and a hat, and was armed with a revolver. At a previous hearing the officer's testimony as to the description he received differed only as to height. At that time the officer said Diaz described the man as 5' 7" to 5' 8" tall. After checking the party hall for suspects but not finding them, two of the police officers departed for the police station with Diaz, Bartley and Bennett in the cruiser. While on their way to the station, one of the three witnesses pointed out two suspects walking along the street approximately one-half block away. One of the two police officers testified that the suspects were approximately three hundred feet away at the time. The suspects turned their heads toward the police car then continued to walk down the street. The police officers then drove around the block to afford the witnesses a better look. When the witnesses said they were sure it was "them," the police officers pulled up in front of the suspects who were about ten feet away, stopped them and searched them. The officers seized a fully loaded revolver from the defendant's belt. The defendant was arrested. The other suspect, who had no gun, was released. The defendant was placed in the front seat of the police car and driven to the police station along with the three witnesses who were seated in the back seat. At the police station one of the officers searched the defendant further and found some paper currency. This money was returned to Diaz.

The officer testified that the person whom he arrested was a black male, approximately 5′ 6″ tall, in his early twenties, wearing white pants, a black suede jacket and a hat. The officer admitted that at a prior hearing he had testified that the defendant's jacket was black denim instead of black suede. The defendant also introduced the correctional center property receipt dated November 21, 1977, which indicated that the defendant's pants were yellow instead of white.

The defendant claims that the trial court erred in its charge to the jury regarding identification testimony. The court instructed the jury that they should consider a witness' "ability to observe facts correctly and to relate them truly and accurately." The court also instructed them that "as to the matter of identification, one of the essential elements the state must prove in every crime is the identification of the defendant as the person who committed the crime. Thus, even if you were to find that a crime had been committed, you must be satisfied beyond a reasonable doubt that this defendant committed the crimes charged before you can find him guilty of the offenses." The defendant claims that the court committed reversible error of constitutional magnitude by refusing to caution the jury, as requested, about the dangers inherent in eyewitness identification testimony.

"Although it would be preferable for a court to charge the jury regarding the dangers of misidentification in an appropriate case, especially when such an instruction is requested, we note with approval the posture of the Second Circuit (Friendly, J.) on this question: 'While a defendant is not entitled to a reading of all that was said

about the dangers of misidentification in *United States* v. *Wade* [388 U.S. 218, 228–36, 87 S. Ct. 1926, 18 L. Ed. 2d 1149] and *Simmons* v. *United States* [390 U.S. 377, 383–84, 88 S. Ct. 967, 19 L. Ed. 2d 1247], we would think it reasonable that a properly drafted instruction, drawing particularly on Mr. Justice Harlan's language in *Simmons,* should be given if requested. Whether failure to do so would constitute reversible error would depend upon the circumstances.' *United States* v. *Fernandez,* 456 F.2d 638, 643–44 (2d Cir.); see also *United States* v. *Evans,* 484 F.2d 1178, 1187–89 (2d Cir.).

"The ultimate test of a court's instructions is whether, taken as a whole, they fairly and adequately present the case to a jury in such a way that injustice is not done to either party under the established rules of law. *State* v. *Mullings,* 166 Conn. 268, 274–75, 348 A.2d 645; *Szlinsky* v. *Denhup,* 156 Conn. 159, 163, 239 A.2d 505." *State* v. *Harden,* 175 Conn. 315, 321–22, 398 A.2d 1169 (1978).[3]

The factual circumstances of this case show that the defendant's conviction did not turn on a dubious identification. The perpetrator confronted Diaz several times at the scene, affording Diaz an appreciable period of time to study his appearance and to later identify him. The perpetrator also confronted Bartley and Bennett before all three of them identified Tinsley on the street for the police officers. Tinsley was not disguised in any way, nor was Diaz' view obstructed but only shaded by the

---

[3] The Second Circuit has continued to follow this approach in more recent cases. *United States* v. *Montelbano,* 605 F.2d 56, 59 (2d Cir. 1979); *United States* v. *Marchand,* 564 F.2d 983, 997 (2d Cir. 1977), cert. denied, 434 U.S. 1015, 98 S. Ct. 732, 54 L. Ed. 2d 760 (1978).

sunglasses. The bulk of Diaz' description never varied. He consistently described a black male in his early twenties with a dark jacket, light pants, a hat and a gun. That he may have said the perpetrator was 5' 5" to 5' 7" in his first description but 5' 7" to 5' 8" in his second description is a slight discrepancy, particularly when considered in light of the two complete descriptions, one given only a few minutes after the incident, the other given when the suspects were apprehended later that same evening, which were identical in every other respect. The fact that both Diaz and the arresting officer said that Tinsley wore white pants when the correctional center property receipt noted that his pants were yellow is also an immaterial discrepancy in light of Diaz' and the officer's identical descriptions. Their descriptions, which may have described the pants as being a shade lighter than what looked like yellow to a corrections official who saw them in a well lit room, were clear, certain and consistent. Their identical descriptions of Tinsley's pants also show that the pants looked white, both to Diaz at the scene when he gave his initial description to the officer, and to the officer when he arrested Tinsley on the street corner. The discrepancy with regard to the fabric of Tinsley's jacket was created by the officer's conflicting descriptions when he testified at two separate hearings. Diaz' eyewitness description of a dark suede jacket was clear and consistent throughout. The fact that the police officer thought that the dark jacket on the man who fit Diaz' description in every other respect was denim does not render Diaz' identification dubious.

At trial Diaz identified Tinsley as the man who had taken his wallet and the man from whom the police had taken the gun that evening. The officers

also identified the defendant as the man arrested that evening. Furthermore, there was circumstantial evidence in the case, including the money found on Tinsley's person at the police station and the gun found in his belt when he was arrested, which also supported the conviction. The court's instructions, when taken as a whole, fairly and adequately presented the case to the jury in such a way that no injustice was done to the defendant. *State* v. *Harden,* supra, 322.

The defendant claims that the trial court erred in refusing to instruct the jury on robbery in the third degree; General Statutes § 53a-136;[4] and larceny in the fourth degree; General Statutes § 53a-125;[5] as lesser included offenses of first degree robbery. A defendant is entitled to an instruction on a lesser offense if, and only if, the following conditions are met: (1) an appropriate instruction is requested by either the state or the defendant; (2) it is not possible to commit the greater offense,

---

[4] General Statutes § 53a-136 provides: "ROBBERY IN THE THIRD DEGREE: CLASS D FELONY. (a) A person is guilty of robbery in the third degree when he commits robbery. . . ."

General Statutes § 53a-133 defines robbery as follows: "A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny."

[5] General Statutes § 53a-125 provides: "LARCENY IN THE FOURTH DEGREE: CLASS C MISDEMEANOR. (a) A person is guilty of larceny in the fourth degree when the value of the property or services is fifty dollars or less. . . ."

Larceny is defined in General Statutes § 53a-119 as follows: "LARCENY DEFINED. A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. . . ."

in the manner described in the information or bill of particulars, without having first committed the lesser; (3) the evidence, introduced by either the state or the defendant, or by a combination of their proofs, justifies conviction of the lesser offense; and (4) the proof on the element or elements which differentiate the lesser offense from the offense charged is sufficiently in dispute to permit the jury consistently to find the defendant innocent of the greater offense but guilty of the lesser. *State* v. *Whistnant,* 179 Conn. 576, 584, 427 A.2d 414 (1980).[6] The record shows that the defendant requested instructions on third degree robbery and fourth degree larceny, that the defendant's requests were denied and that the defendant excepted to the court's ruling. The information alleged "that at the City of Bridgeport, in said County, on the 19th day of November 1977, at or about 10:30 p.m. in the area of the Pequonnock Apartments, Bridgeport, the said Larry W. Tinsley stole certain property from one Hector Diaz to wit: current monies of the United States of America, and in the course of the commission of the crime was armed with a deadly weapon, to wit: a .22 Calibre Revolver, in violation of Section 53a-134 (a) (2) of the Connecticut General Statutes." Since it is not possible to commit the greater offense in the manner described by the information without having first committed third degree robbery and fourth degree larceny, the second criterion of the test established in *State* v. *Whistnant,* supra, is also satisfied.

---

[6] In view of the manner in which the third condition of the rule enunciated in *State* v. *Whistnant,* 179 Conn. 576, 584, 427 A.2d 414 (1980), was applied in *State* v. *Whistnant,* supra, 584, and *State* v. *Morin,* 180 Conn. 599, 601-602, 430 A.2d 1297 (1980), and the manner in which it is applied in this case, the third condition is stated more precisely above than it was in *State* v. *Whistnant,* supra.

The defendant contends that the third condition of *State* v. *Whistnant* was satisfied because there was evidence that the perpetrator threatened Diaz with the immediate use of physical force when he took the twenty-nine dollars from Diaz, thereby justifying a conviction for third degree robbery, and because there was evidence that the perpetrator took the twenty-nine dollars with the intent to deprive Diaz of the money, thereby justifying a conviction for fourth degree larceny. We agree with the defendant's contention on the third condition as to third degree robbery but cannot agree as to fourth degree larceny. There is no evidence that the perpetrator took the money from Diaz without using or threatening the immediate use of physical force, which is an element of robbery. Evidence that he pointed the gun at Bartley's head and threatened to shoot Bartley with Diaz watching instead of pointing it at Diaz' head and threatening to shoot Diaz is irrelevant to a determination of whether the perpetrator used or threatened the immediate use of physical force on another person for the purpose of preventing or overcoming resistance to the taking of the property. General Statutes § 53a-133 (1). On the facts presented in the briefs, it is reasonable for this court to assume, as Diaz could only assume, that the perpetrator's actions threatening the immediate use of force against Bartley applied to Diaz as well. A few minutes earlier the man had demanded Diaz' gloves, his companions had taken Diaz' watch, ring and change, and he had ordered Diaz and Bartley into the building. As in *State* v. *Whistnant,* supra, 586-87, the defendant did not introduce evidence to show there was no use or threatened immediate use of physical force, the element which distinguishes larceny from

robbery. The evidence relied upon by the defendant at trial was evidence elicited upon cross-examination to show that Diaz had misidentified the culprit, not that the culprit took Diaz' money but without force or threat of immediate force. The court's denial of the defendant's request to charge on fourth degree larceny was not in error. *State* v. *Whistnant*, supra, 583.

The trial court did not err in denying the defendant's request to charge on third degree robbery because the proof on the element which differentiates robbery in the first and third degrees was not in dispute as a matter of law, and hence the fourth condition of *State* v. *Whistnant* was not satisfied. There was no evidence to show that the perpetrator did not hold a gun to Bartley's head and threaten to shoot him in Diaz' presence. Nor was there any evidence to show that this was not a gun from which a shot could have been discharged. The defendant also acknowledges in his statement of facts that the evidence shows that "less than a minute later" and in the very same place, after putting the gun "behind him or somewhere else" and permitting Bartley and Bennett to leave, the perpetrator demanded Diaz' money. Other than the fact that he replaced the weapon in his trousers or put it behind him out of sight moments before demanding Diaz' money, there was no evidence to show that the perpetrator was not "armed with a deadly weapon" under the definition of first degree robbery as contained in General Statutes § 53a-134 (a) (2).

"[I]t is not necessary for a weapon to be exhibited, displayed, utilized or referred to in order for one to be considered 'armed.'" *State* v. *Anderson*, 178 Conn. 287, 294, 422 A.2d 323 (1979). The

word "armed" simply requires that a weapon be in one's possession. Id. Here the deadly weapon was not only in the perpetrator's possession when he demanded Diaz' money, but it also had been clearly displayed to Diaz and his friends to threaten the immediate use of force less than a minute earlier. As a matter of law the proof on the element which differentiates first degree robbery from third degree robbery was not in dispute in this case. The court did not err in denying the defendant's request to charge on third degree robbery.

The defendant moved the court to suppress oral testimony regarding the currency taken from the defendant at police headquarters and later returned to the victim. The court admitted this testimony and the defendant took an exception. Apparently, at some time after the defendant's arrest but before trial, the money taken from the defendant was returned to the victim. That currency was not introduced as an exhibit at trial. General Statutes § 54-36a (b) authorizes the return of stolen property to the owner but provides that "[w]hen any such return under the provisions of this section has deprived any defendant in a criminal case of the opportunity to examine, test, or appraise such property to such defendant's prejudice, any secondary evidence of the identity, description or value of such property shall not be admissible in evidence against such defendant in the trial of such case."

When a party claims error in the admission of evidence, Practice Book, 1978, § 3060F (3) requires that party to include the question or offer of exhibit, the objection and the ground on which it was based, the answer if any and the ruling and any exception. When the basis of the ruling cannot

be understood without a knowledge of the evidence or proceeding which preceded or followed the ruling, a brief narrative or verbatim statement of the evidence or proceeding should be made. The reason for this rule is well illustrated by this case. The defendant's brief states only that the currency was not made an exhibit, that secondary evidence was offered and that the defendant made some kind of objection. Under these circumstances the claimed error is not reviewable. Furthermore, there is no showing that the defendant ever sought to examine, test or otherwise see the currency taken. The only claim of prejudice in the brief is that if the currency had been introduced as evidence, it could have been checked for the fingerprints of the victim to determine whether he had ever touched it. Whether this claim was made to the court is unknown, but even if it was, it is conjectural at best, especially concerning currency. Furthermore, the identity of the currency was not crucial to the charge made in the information.

The second count charged the defendant with carrying "on his person a .22 Calibre Revolver without a legal permit therefore, and not being within his dwelling house or place of business, in violation of Section 29-35 of the Connecticut General Statutes."[7] The state acknowledges that the only evi-

---

[7] General Statutes § 29-35 provides: "CARRYING OF PISTOL OR REVOLVER WITHOUT PERMIT RESTRICTED. No person shall carry any pistol or revolver upon his person, except when such person is within his dwelling house or place of business, without a permit to carry the same issued as provided in section 29-28. The provisions of this section shall not apply to the carrying of any pistol or revolver by any marshal, sheriff, parole officer or peace officer, or to any member of the armed forces of the United States, as defined by section 27-103, or of this state, as defined by section 27-2, when on duty or going to or from duty, or to any member of any military organization when on parade or when going to or from any place

dence produced pertained to two elements of the crime: that the defendant carried a revolver upon his person and that he did not have a permit. Since the revolver was found in the defendant's possession when he was arrested on the street, whether he was "within his dwelling house or place of business" was not in issue. The trial court instructed the jury in accordance with the defendant's claims that the state also bore the burden of proving that the defendant was not a marshall, sheriff, parole officer, peace officer, member of the armed forces on parade or any other person excepted under the conditions enumerated in the statute.

It is the general rule that where exceptions to a prohibition in a criminal statute are situated separately from the enacting clause, the exceptions are to be proven by the defense. This rule had its origin in an article by Theron Metcalf published anonymously in the American Jurist for October, 1832. After he was elevated to the bench in Massachusetts, Metcalf restated the rule in the leading case of *Commonwealth* v. *Hart,* 65 Mass. (11 Cush.) 130, 134 (1853). See 153 A.L.R. 1218, 1222. In *State*

of assembly, or to the transportation of pistols or revolvers as merchandise, or to any person carrying any pistol or revolver while contained in the package in which it was originally wrapped at the time of sale and while carrying the same from the place of sale to the purchaser's residence or place of business, or to any person removing his household goods or effects from one place to another, or to any person while carrying any such pistol or revolver from his place of residence or business to a place or person where or by whom such pistol or revolver is to be repaired or while returning to his place of residence or business after the same has been repaired, or to any person carrying a pistol or revolver in or through the state for the purpose of taking part in competitions or attending any meeting or exhibition of an organized collectors' group if such person is a bona fide resident of the United States having a permit or license to carry any firearm issued by the authority of any other state or subdivision of the United States."

v. *Miller,* 24 Conn. 522, 529 (1856), this state recognized the rule. See also *State* v. *McGee,* 88 Conn. 353, 359, 91 A. 270 (1914).

The matters which the defendant claims must be proven by the state are not only contained in a separate sentence of the statute, but also form no part of the statute's enacting or prohibiting clause. They are not descriptive negatives defining the corpus delicti but are exceptions, and they do not form any essential elements of the crime charged. See *State* v. *Anonymous,* 179 Conn. 516, 519, 427 A.2d 403 (1980); *State* v. *Beauton,* 170 Conn. 234, 241, 365 A.2d 1105 (1976). General Statutes § 29-35 has only two essential elements. One is carrying a pistol while outside a dwelling house or place of business. The other is the absence of a permit. *State* v. *Guthridge,* 164 Conn. 145, 152–53 and n.4, 318 A.2d 87 (1972). The burden is not upon the state to disprove every listed exception in the statute. Furthermore, in this case, the defendant offered no evidence to put the exceptions in issue. See *Mullaney* v. *Wilbur,* 421 U.S. 684, 701 n.28, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975). The fact that the state offered no evidence to disprove the statutory exceptions did not violate the defendant's rights under the fifth, sixth and fourteenth amendments to the United States constitution as claimed. The court was in error in its instructions to the jury on the second count.

The state claims that since the error was favorable to the defendant, it was harmless. In this case, however, other factors must be considered. The court instructed the jury that the statutory exceptions must be proven by the state. The parties agree, however, that no evidence on the exceptions

was presented. The jury's verdict of guilty on the second count was contrary to the instructions of the court because there was no evidence to support the nonexistence of the statutory exceptions. It is evident that the jury did not follow the court's instructions. Where it is clear that the jury violates the instructions of the court, their verdict should be set aside. *R. F. Baker Co.* v. *P. Ballantine & Sons,* 127 Conn. 680, 683-84, 20 A.2d 82 (1941). Although in this case the court's instructions were in error, it is not the function of the jury to correct erroneous instructions but to follow them. When jury instructions are in error, this court will remedy the situation on appeal. If this were not the rule, the jury would be permitted to ignore the court's instructions if it felt that the legal principles enunciated by the court are not, or should not be, the law and the result would be chaotic.

The remaining question is whether the erroneous instructions of the court were likely to have affected the verdict and to have prejudiced the rights of the defendant, or whether the court's error was harmless. *Galligan* v. *Blais,* 170 Conn. 73, 78, 364 A.2d 164 (1976); *Kulinski* v. *Savin,* 125 Conn. 512, 514, 7 A.2d 436 (1939).

It is true that there was sufficient evidence to support the verdict on the elements necessary to convict, but it is unknown whether the jury's deliberate decision to ignore the court's charge on the multiple exceptions, albeit erroneous, spilled over into or affected their consideration of the elements upon which the state had the burden of proof beyond a reasonable doubt. *State* v. *Loughlin,* 149 Conn. 21, 28, 175 A.2d 367 (1961). See also *Natale* v. *White,* 158 Conn. 618, 619, 262 A.2d 184 (1969) where the

combination of correct and erroneous instructions was found harmful even in the absence of a clear failure by the jury to follow the court's instructions. Under the peculiar circumstances of this case, justice requires a new trial on the second count of the information.

There is no error as to the first count; there is error as to the second count, the judgment is set aside and the case is remanded for a new trial solely as to the second count.

In this opinion COTTER, C.J., BOGDANSKI and PETERS, Js., concurred.

ARTHUR H. HEALEY, J. (concurring in part and dissenting in part.) I concur in the result reached by the court on the crime of robbery in the first degree. I do not, however, agree with that portion of the majority opinion which concludes that the erroneous instruction of the court, which placed the burden on the state to prove that the defendant was not a person excepted from the prohibition of General Statutes § 29-35, was harmful to the defendant and constituted reversible error. It has always been the law of this state that an erroneous instruction that has, nevertheless, not affected the result is not reversible error. See *State* v. *Ruth,* 181 Conn. 187, 197, 435 A.2d 3 (1980); *State* v. *McClain,* 171 Conn. 293, 300, 370 A.2d 928 (1976); *State* v. *Tropiano,* 158 Conn. 412, 427, 262 A.2d 147, cert. denied, 398 U.S. 949, 90 S. Ct. 1866, 26 L. Ed. 2d 288 (1969).

In this case it is clear that the error could not possibly have affected the verdict. The court did improperly instruct the jury that an essential element of the offense defined in General Statutes § 29-35 was that the defendant was not, at the time

the offense was committed, a person excepted from the prohibition of General Statutes § 29-35 and that the state had the burden of proof on this element. Because it is concluded, and properly so, that the state never had the burden of proving that the defendant was not within the category of persons excepted from the statute, it is of no consequence that the jury erroneously believed that the state had proven the non-applicability of the exception beyond a reasonable doubt. This instruction was unnecessary to the charge. We have held that where the court, in its instructions to the jury, erroneously charges on a matter which is not necessary to sustaining the verdict, that error is harmless. See *Ramonas* v. *Zucker*, 163 Conn. 142, 148, 302 A.2d 242 (1972). See also *State* v. *Roy*, 173 Conn. 35, 42–44, 376 A.2d 391 (1977).

Here, it is undisputed that the evidence was sufficient to prove each essential element of the offense of carrying a pistol or revolver in violation of General Statutes § 29-35. No claim of error is directed to any other portion of the instructions on this offense. I, therefore, believe that the erroneous and extraneous portion of the instructions given on this offense could not possibly have affected the result and was, as a consequence, harmless.

I would find no error.