STATE OF CONNECTICUT *v.* JOHN MANLEY
(10946)

HEALEY, PARSKEY, SHEA, DANNEHY and QUINN, Js.

Argued December 12, 1984—decision released April 2, 1985

*Jon C. Blue,* assistant public defender, with whom, on the brief, was *Joette Katz,* public defender, for the appellant (defendant).

*Guy W. Wolf III,* assistant state's attorney, with whom was *Arnold Markle,* state's attorney, for the appellee (state).

ARTHUR H. HEALEY, J. The defendant, John Manley, was charged by information with robbery in the first degree in violation of General Statutes § 53a-134 (a) (2),[1] larceny in the third degree in violation of General Stat-

---

[1] "[General Statutes] Sec. 53a-134. ROBBERY IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime: (1) Causes serious physical injury to any person who is not a participant in the crime; or (2) is armed with a deadly weapon; or (3) uses or threatens the use of a dangerous instrument; or (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm; except that in any prosecution under this subdivision, it is an affirmative defense that such pistol, revolver, rifle, shotgun, machine gun or other firearm was not a weapon from which a shot could be discharged. Nothing contained in this subdivision shall constitute a defense to a prosecution for, or preclude a conviction of, robbery in the second degree, robbery in the third degree or any other crime."

utes § 53a-124 (a),[2] and using a motor vehicle without the owner's permission in violation of General Statutes § 53a-119b.[3] All three charges arose from the same incident. After a jury trial the defendant was found guilty as charged. He appeals.

The jury could reasonably have found the following facts. On June 20, 1980, Ann Twaroski, a school teacher, was returning in the afternoon to her home on Pardee Place, New Haven. While she was attempting to parallel park her 1975 Oldsmobile Cutlass at the corner of Pardee and Fountain Streets, she noticed two young men sitting on a brick wall that surrounds the corner property. At the time, the doors to her vehicle were locked, and the driver's window was rolled down some five to six inches. Three other youths in the neighborhood had also observed these two men.

Twaroski's initial attempt to parallel park was not successful, and she prepared to pull out into the street for a second attempt. While the vehicle was stopped and her foot was on the brake, she turned her head from

[2] At the time the offense was committed, General Statutes § 53a-124 (a), entitled "Larceny in the third degree," provided: "A person is guilty of larceny in the third degree when: (1) The value of the property or service exceeds fifty dollars; or (2) the property consists of a public record, writing or instrument kept, held or deposited according to law with or in the keeping of any public office or public servant; or (3) the property consists of a sample, culture, microorganism, specimen, record, recording, document, drawing or any other article, material, device or substance which constitutes, represents, evidences, reflects, or records a secret scientific or technical process, invention or formula or any phase or part thereof. A process, invention or formula is 'secret' when it is not, and is not intended to be, available to anyone other than the owner thereof or selected persons having access thereto for limited purposes with his consent, and when it accords or may accord the owner an advantage over competitors or other persons who do not have knowledge or the benefit thereof."

[3] General Statutes § 53a-119b (a) provides: "A person is guilty of using a motor vehicle without the owner's permission when: (1) He operates or uses, or causes to be operated or used, any motor vehicle unless he has the consent of the owner; or (2) he obtains the consent of the owner to the use of his motor vehicle by fraud or fraudulent means, statement or representations."

facing the rear of the vehicle towards the front, and suddenly became aware that one of the two men she had seen sitting on the wall was approaching the driver's side of her car. She heard "a voice" and "turned around," and at that point, when she saw him next to the car, she reached in vain to close the driver's side window. Later identified by her as the defendant, this man, "black, in his twenties, sunglasses on, a dark jacket," however, had reached through that partially opened window and unlocked the driver's side door on the inside. He then opened the driver's side door using the outside handle.

As he opened the door, the defendant said to Twaroski: "Move over or I will kill you. I have a gun." She then saw "a silver gun," the barrel of which "was fairly long and narrow." Twaroski did not comply with the defendant's demand, however. Instead, she resisted by screaming, grasping the car's steering wheel, and "blasting" the horn. The defendant then repeatedly struck her with his gun on her hands, shoulder, and head. He "ripped" her watch from her arm and attempted to remove her ring from her finger. During the struggle, the defendant demanded that Twaroski "move over" and, at one point, he placed his hand over her mouth. She finally managed to push the defendant so as to allow her escape from the vehicle, but she then either was pushed or fell face down in the middle of the road.[4]

Shawn Rothwell, a fifteen year old newspaper carrier at the time, had observed, prior to the incident, the two men as they alternated "getting up" from the wall in order to look into a nearby supermarket park-

---

[4] At trial, Twaroski testified that, as a result of this incident, she sustained the following injuries: "My head, lumps on my head, bruises, cuts on my hand, my arm, bruises on my arm, my elbow was cut, my knees were also cut, the skin, and bruises on my leg [and] also my ankle."

ing lot. To young Rothwell, the men appeared to be "nervous." He then observed the incident in progress and ran to get his father, Michael Rothwell.

Meanwhile, Twaroski's vehicle, which was still in gear, began to roll down the street as the defendant attempted to get fully inside. As Michael and Shawn Rothwell ran down the street towards the scene of the crime, the defendant, seeing them, left the car, raised the gun, and "fired" it in the direction of Michael Rothwell. The defendant entered the vehicle and drove away. When taken by the defendant, the vehicle contained Twaroski's purse, wallet, driver's license, cash in the amount of $64 to $67, a gold chain valued at $100, credit cards, eyeglasses, and school-related materials. Three other young neighbors also witnessed the incident.

Approximately thirty-five minutes later, Helen Myers observed the Twaroski vehicle parked on the northbound shoulder of the Wilbur Cross Parkway, "just outside of the [Wilbur Cross Parkway] tunnel" but still in New Haven. Myers, who had been visiting with a priest at her mother's house in the Twaroski neighborhood at the time of the incident, was aware of the general circumstances regarding the crime when she observed the vehicle, which she recognized as belonging to Twaroski. About five to ten minutes later when she arrived at a shopping center in Hamden, Myers called the New Haven police department and reported seeing the vehicle on the parkway. Within minutes, Connecticut State Trooper Harold Lufgren was dispatched to investigate the vehicle; he arrived there within twenty-five minutes of that dispatch. Lufgren found the Twaroski vehicle abandoned on the parkway shoulder approximately 1.7 miles from the scene of the crime with the car's engine still running.

The next afternoon, Wilburt Thorne, who lived a short distance from the defendant, found Twaroski's purse, wallet and identification papers in a parking lot by his home on Wilmot Road, New Haven, a three to five minute walk from the Wilbur Cross Parkway tunnel.[5] Thorne notified the police, and Twaroski's purse, wallet and papers were recovered and thereafter returned to her. Her money, gold chain and some of her credit cards were not recovered. Her watch, which the defendant had torn from her wrist, was found in the glove compartment of her abandoned automobile.

Later on the day of the actual incident, Twaroski, who was still "quite distraught," had been unable to identify positively her assailant from police photographs. At trial, she did identify the defendant as the perpetrator. The defendant was also implicated by latent fingerprint evidence processed from Twaroski's vehicle. Three such fingerprints were identified as the defendant's: a print of his left middle finger upside down on the top edge of the interior of the driver's door glass window and two prints of his right ring and little fingers on the top of the automatic transmission gear shift lever.

On appeal, the defendant claims that the trial court erred: (1) in refusing to charge on robbery in the third degree as a lesser included offense of robbery in the first degree; (2) in refusing during trial to admonish the jury that an earlier set of his fingerprints admitted into evidence could have been taken by the police for a purpose unrelated to crime; (3) in denying his request to charge the jury that fingerprint evidence standing alone is sufficient for a conviction only if the fingerprints were found under such circumstances that they could only have been impressed at the time of the

---

[5] Wilburt Thorne resided at 278 Wilmot Road. A detective for the New Haven police department testified that the defendant resided at 328 Wilmot Road in June, 1980, the time of the incident.

crime; and (4) in denying his request to charge the jury on the dangers of misidentification and the factors to be considered in evaluating the likelihood of misidentification.[6] We find no error.

## I

The defendant's most arguable claim is that the trial court erred in refusing to charge on robbery in the third degree as a lesser included offense of robbery in the first degree. In the first count of the information, the state charged the defendant with a violation of General Statutes § 53a-134 (a) (2). This count specifically required the state to prove beyond a reasonable doubt that the defendant committed the crime of robbery; see General Statutes § 53a-133;[7] while "armed with a deadly weapon, to wit: a pistol or revolver." General Statutes § 53a-134 (a) (2). He contends that the trial court's failure to grant his timely written request to charge the jury on robbery in the third degree which requires no weapon be used as a lesser included offense compels a reversal of his conviction. The gravamen of his claim is that, because neither the actual weapon used nor any bullet was ever recovered,[8] the court

---

[6] Prior to oral argument, the defendant withdrew his claim that the trial court erred in denying a pretrial discovery request.

[7] "[General Statutes] Sec. 53a-133. ROBBERY DEFINED. A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny."

[8] We note that the defendant does not claim that it was imperative that a weapon be admitted into evidence in order for there to have been sufficient evidence to convict him of this crime. See *Brown* v. *State,* 266 Ind. 82, 86, 360 N.E.2d 830 (1977) (commission of or attempt to commit a felony while armed with a deadly weapon; weapon need not be physically admitted when seen by witnesses to crime). Moreover, we also note that the "operability" of a firearm may be proved by eyewitness testimony without the

should have granted this request to charge on the lesser included offense. A careful review of the record in the trial court and the applicable law, however, require us to reject this claim.

"In *State* v. *Whistnant,* 179 Conn. 576, 588, 427 A.2d 414 (1980), this court articulated a four pronged test for determining when it is proper to charge a jury with respect to a lesser included offense. 'A defendant is entitled to an instruction on a lesser offense if, and only if, . . . (1) an appropriate instruction is requested by either the state or the defendant; (2) it is not possible to commit the greater offense, in the manner described in the information or bill of particulars, without having first committed the lesser; (3) there is some evidence, introduced by either the state or the defendant, or by a combination of their proofs, which justifies conviction of the lesser offense; and (4) the proof on the element or elements which differentiate the lesser offense from the offense charged is sufficiently in dispute to permit the jury consistently to find the defendant innocent of the greater offense but guilty of the lesser.' " *State* v. *Vass,* 191 Conn. 604, 616-17, 469 A.2d 767 (1983).

The focal question raised by the defendant's claim involves the fourth prong of the *Whistnant* test: whether the evidence of the element that differentiated

recovery and admission into evidence of the weapon. See *State* v. *Cole,* 154 N.J. Super. 138, 145–47, 381 A.2d 40 (1977), cert. denied, 78 N.J. 415, 396 A.2d 602 (1978) (no weapon fired); *State* v. *Schultheis,* 113 N.J. Super. 11, 16, 272 A.2d 544, cert. denied, 58 N.J. 390, 277 A.2d 882 (1971) (no weapon fired); *State* v. *Mathe,* 35 Wash. App. 572, 581–82, 668 P.2d 599 (1983), aff'd on other grounds, 102 Wash. 2d 537, 688 P.2d 859 (1984) (no weapon fired). " 'A reasonable fact finder may, of course, infer operability from an object which looks like, feels like, sounds like or is like, a firearm. Such an inference would be reasonable without direct proof of operability.' " *Commonwealth* v. *Holguin,* 254 Pa. Super. 295, 303, 385 A.2d 1346 (1978) ("bullet holes and spent lead slugs" found), quoting *Commonwealth* v. *Layton,* 452 Pa. 495, 498, 307 A.2d 843 (1973).

the included offense of robbery in the third degree from robbery in the first degree, in this case the "armed with a deadly weapon" element, was "sufficiently in dispute to permit the jury consistently to find the defendant innocent of the greater offense but guilty of the lesser." Id., 617; *State* v. *Whistnant,* supra. "We must answer in the affirmative if viewing the evidence in the light most favorable to the defendant; *People* v. *Shuman,* 37 N.Y.2d 302, 304, 333 N.E.2d 363 (1975); reasonable minds could differ upon the existence or nonexistence of the element that distinguishes the inclusive from the included offense. *State* v. *Morin,* 180 Conn. 599, 610–11, 430 A.2d 1297 (1980) (*Healey, J.,* dissenting). Otherwise the defendant would lose the right to have the jury pass upon every factual issue fairly presented by the evidence. *Stevenson* v. *United States,* 162 U.S. 313, 314, 16 S. Ct. 839, 40 L. Ed. 980 (1896) . . . ." *State* v. *Smith,* 185 Conn. 63, 77–78, 441 A.2d 84 (1981); *State* v. *Gordon,* 185 Conn. 402, 423, 441 A.2d 119 (1981), cert. denied, 455 U.S. 989, 102 S. Ct. 1612, 71 L. Ed. 2d 848 (1982). This, of course, requires a determination whether the matter involved is "sufficiently in dispute" under the fourth prong of *Whistnant.*

As stated, the defendant was charged by information with a violation of § 53a-134 (a) (2), armed with a deadly weapon "to wit: a pistol or revolver," so it was incumbent upon the state to prove beyond a reasonable doubt the existence of the element of a "deadly weapon." A "deadly weapon" is defined in General Statutes § 53a-3 (6) as, inter alia, "any weapon, whether loaded or unloaded, from which a shot may be discharged . . . ."[9] Because neither the actual

---

[9] In its entirety, General Statutes § 53a-3 (6) provides: " 'Deadly weapon' means any weapon, whether loaded or unloaded, from which a shot may be discharged, or a switchblade knife, gravity knife, billy, blackjack, bludg-

weapon nor any bullet had been recovered, the defendant contends that the issue of the weapon's "operability" was sufficiently in dispute for purposes of the fourth prong of *Whistnant* to require in this case a jury charge on the lesser included offense as requested. We assess that claim on the record before us.

The jury heard the following testimony regarding the "deadly weapon": Mrs. Twaroski testified that the defendant, upon opening her car door without her consent, demanded: "Move over or I will kill you. I have a gun."[10] She "did see the gun"; it was "silver" and "the front of it was fairly long and narrow." The defendant had struck her repeatedly with the gun. She conceded her unfamiliarity with guns, but when she was lying in the street after escaping from the defendant, she witnessed the defendant "crouching slightly" and aiming the gun in the direction of Michael Rothwell, who at that time was in pursuit of the defendant. She then 'heard the gun discharged [sic]." Although Twaroski was rigorously cross-examined and also underwent three recross-examinations, defense counsel *never* directed any inquiries to her regarding her testimony about the weapon in this case.

Jason Goldfarb, an eleven year old neighbor, testified that he first saw the "two men sitting on the wall," then heard Twaroski "yell." He also saw her lying on the street and Rothwell "coming down the street"; he

---

eon, or metal knuckles. The definition of 'deadly weapon' in this subdivision shall be deemed not to apply to section 29-38 or 53-206."

The state did not try this case on the theory that the "deadly weapon" involved here was the gun used as a "bludgeon." See Perkins, Criminal Law (2d Ed. 1969) p. 131 ("A firearm might be used as a club whether loaded or unloaded"); footnote 4, supra.

[10] We note that one court has held that a defendant who pointed a weapon at a victim while admonishing her, " 'Lady, don't come any closer or I'll shoot,' " had, in effect, made "an assertion that the weapon was loaded and lethal." *State* v. *Lutjen,* 661 S.W.2d 845, 847 (Mo. Ct. App. 1983) (affirming conviction of burglary first degree, stealing without consent and unlawful use of weapons).

then heard "a shot." There was *no* cross-examination by defense counsel of this witness. Stephanie Chandler, a fifteen year old, who witnessed the incident, testified: "I saw a lady trying to get away from a man who was in the car, and she was banging on the door . . . I saw she was pushed out into the street, and I heard a gunshot; and I saw Mr. Rothwell turn up the street . . . . " Later, on direct examination, young Chandler again testified that she "heard a gunshot." On cross-examination, defense counsel asked her only one question, and it related *not* to her observations as an eyewitness, but rather to whether she looked at any police photographs.

Newspaper carrier Shawn Rothwell testified, as stated above, as an eyewitness to the incident. He related that his father "was about 20 yards from the car when the guy had pulled out . . . a silver-plated gun, and he [the defendant] brought his arm up like this, and he shot over with his right hand . . . I heard the firing off." Young Rothwell reiterated that "when he [the defendant] saw my father coming, his first reaction was, pull the gun out. And he took it out like this and he shot once." As with Stephanie Chandler, defense counsel's *only* inquiries on cross-examination of Shawn Rothwell were directed to whether he looked at police photographs of possible suspects.

More detailed testimony concerning the weapon was provided by Shawn's father, Michael Rothwell. Rothwell testified that he was about thirty or thirty-five yards away when he "saw the chromeplated barrel come over and he fired." Michael Rothwell further testified that he had hunted with a variety of guns and had owned a variety of handguns. He had not been able to identify visually the defendant's gun because he had only seen its barrel, but he testified that the sound of the discharge was familiar to him as the sound of a .22 or .25 calibre firearm. He also testified that he had

heard that sound "[m]any times before." Defense counsel did voir dire Rothwell as to his personal experience with firearms[11] but otherwise did *not* cross-examine him at all.

In sum then, five witnesses for the state testified regarding the incident and the gunshot. The defense neither presented its own witnesses nor did it cross-examine *any* of these five witnesses regarding their testimony about the gunshot. While we agree with the defendant that jurors in criminal cases should be "free to reject even uncontradicted testimony, if they do not find it credible"; *State* v. *Dudla,* 190 Conn. 1, 7, 458 A.2d 682 (1983); we are not persuaded by the defendant's claim that the "proof" differentiating robbery in the third degree from the charged offense of robbery in the first degree was "sufficiently in dispute" under the fourth prong of *Whistnant* to require an instruction on the claimed lesser included offense.

While this defendant, of course, was under no obligation to present evidence in his own behalf, we recognize as a practical matter that the defendant, for purposes of the *Whistnant* test, ought, in order to be entitled to a jury instruction on a lesser included offense, to endeavor to place a particular element of the crime charged "sufficiently in dispute" under the fourth prong of *Whistnant.* This could occur either through the right of cross-examination, the major function of which is to put certain matters in dispute, or through evidence presented as part of the defendant's case. *State* v. *Vass,* supra, 619.

[11] After a voir dire of Michael Rothwell by defense counsel and very brief argument by both trial counsel, the trial court then ruled that a sufficient foundation had been laid regarding Rothwell's competency to testify as to his opinion of the approximate calibre of the weapon discharged by the defendant. Although the defendant took exception to this ruling, he does not claim it as error on appeal. At oral argument even appellate defense counsel characterized Rothwell as a "lay-expert."

In this case, the defendant, as was his choice, decided not to pursue either of these courses. It is not at all improper that the defendant, requesting a lesser included offense instruction, bear an obligation, weak though it may be, to demonstrate that there is evidence "sufficiently in dispute" to warrant giving the requested instruction. See *Rouse* v. *United States,* 402 A.2d 1218, 1221 (D.C. App. 1979); *Day* v. *United States,* 390 A.2d 957, 962 (D.C. App. 1978). The fourth prong of *Whistnant* specifically requires that the "proof" be "sufficiently in dispute." Such proof is "sufficient" when it is "marked by [a] quality [such as] to meet with the demands, wants or needs of a situation . . . ." Webster, Third New International Dictionary. In the *Whistnant* context, therefore, the proof is "sufficiently in dispute" where it is of such a factual quality that would permit the finder of fact reasonably to find the defendant guilty on the lesser included offense. This requirement serves to prevent a jury from capriciously convicting on the lesser included offense when the evidence requires either conviction on the greater offense or acquittal. See *Sansone* v. *United States,* 380 U.S. 343, 349–50, 85 S. Ct. 1004, 13 L. Ed. 2d 882 (1965); *Sparf and Hansen* v. *United States,* 156 U.S. 51, 63–64, 15 S. Ct. 273, 39 L. Ed. 343 (1895); *United States* v. *Brown,* 551 F.2d 236, 239 n.4 (8th Cir. 1977). This rationale comports with the view that "[f]act finding does not require mathematical certainty. [But] [j]urors are supposed to reach their conclusions on the basis of common sense, common understanding and fair beliefs, grounded on evidence consisting of direct statements by witnesses or proof of circumstances from which inferences can fairly be drawn." *Schulz* v. *Pennsylvania R. Co.,* 350 U.S. 523, 526, 76 S. Ct. 608, 100 L. Ed. 668 (1956). Moreover, the trial court, in making its determination whether the proof is "sufficiently in dispute," while it must carefully assess all the evidence whatever its source, is "not required to put the case

to the jury on a basis [of a lesser included offense] that essentially indulges and even encourages speculations as to [a] bizarre reconstruction [of the evidence]." *United States* v. *Sinclair,* 444 F.2d 888, 890 (D.C. Cir. 1971).

We have chronicled at some length the evidence that goes to the "sufficiently in dispute" claims of the defendant. We conclude that the trial court properly refused the request to charge. Any fair view of the evidence, short of one that would be speculative, shows that the matter involved was not "sufficiently in dispute." The "proof" under *Whistnant* must be "sufficiently in dispute"; here it was *not* in dispute.

In this regard, the defendant contends that his trial counsel's argument to the jury concerning the possibility that the gun may have been a starter pistol placed the element in question sufficiently in dispute. We do not agree. With no evidence or testimony of any kind before the jury that the defendant's gun could have been a starter pistol, it would have been "sheer speculation"; *State* v. *Vitale,* 190 Conn. 219, 234 n.7, 460 A.2d 961 (1983); for the jury to have considered that argument seriously. Cf. *Harpman* v. *State,* 435 So. 2d 375 (Fla. Dist. Ct. App. 1983) (starter pistol in evidence). Moreover, as a general rule, trial counsel should not state or suggest an inference from facts that are not in evidence. *State* v. *Ubaldi,* 190 Conn. 559, 575, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983); State v. *Haskins,* 188 Conn. 432, 457, 450 A.2d 828 (1982); *State* v. *Kinsey,* 173 Conn. 344, 351, 377 A.2d 1095 (1977) (*Loiselle, J.,* concurring); *State* v. *Ferrone,* 96 Conn. 160, 169, 113 A. 452 (1921). As rhetorical advocacy, the defense counsel's argument to the jury did not serve, in the absence

of *any* proof during trial, to place the matter "sufficiently in dispute" for the purposes of the fourth prong of *Whistnant*.[12]

While the defendant maintains that the "sufficiently in dispute" prong was satisfied by both the "shortcomings" in the state's case as well as his decision to leave the state to its proof, we do note that he has not articulated a claim that the verdict should be set aside because of insufficient evidence. See *Jackson* v. *Virginia,* 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). While this case did not require the requested instructions, we do recognize that "the jury's role as fact-finder is so central to our jurisprudence that, in close cases, the trial court should generally opt in favor of giving an instruction on a lesser included offense, if it is requested." *United States* v. *Comer,* 421 F.2d 1149, 1154 (D.C. Cir. 1970). Under these circumstances, however, the proof on the element that differentiates first-degree robbery from third-degree robbery, as a matter of law, was not "sufficiently in dispute"; see *State* v. *Tinsley,* 181 Conn. 388, 400, 435 A.2d 1002 (1980), cert. denied, 449 U.S. 1086, 101 S. Ct. 874, 66 L. Ed. 2d 811 (1981); and thus, the trial court properly refused to charge as requested.

## II

The defendant's remaining three claims concern the identification of him as the perpetrator in this case. The defendant first claims error in the curative instruction given by the trial court regarding the origin of a police

[12] After the trial court had charged the jury, the state withdrew its prior opposition to an instruction on the lesser included offense of robbery in the third degree. At that time, the state acquiesced to giving this charge out of an "abundance of caution." We are unpersuaded by the defendant's suggestion that the state's postinstruction change of heart mandates a reversal here on appeal. Whether the fourth prong of the test for an instruction on a lesser included offense has been satisfied is a mixed question of law and fact that the trial court is uniquely positioned to pass upon, and its determination, unless clearly erroneous, will not be reversed.

card containing his fingerprints. Specifically, he argues that the trial court erred in refusing to admonish the jury that his fingerprints on that card could have been taken by the police for a noncriminal purpose. This claim arose at trial when the state offered into evidence the card bearing the defendant's fingerprints; it had been used by the police for comparison with the latent fingerprints lifted from the abandoned Twaroski vehicle.

During the course of laying the foundation for introducing this card into evidence, the police officer testifying described the proposed exhibit as "a standard fingerprint card of the New Haven Police Department taken from the subject on October 13, 1976, pursuant to a criminal investigation of the defendant, fingerprint card impression of the suspect involved."[13] Defense counsel objected and requested a mistrial or, in the alternative, a curative instruction by the court. The trial court denied the request for a mistrial[14] and immediately instructed the jury: "Before we go back to any further questioning, I want to tell you as a jury apparently the witness made reference to the fact that this card, when a foundation was being laid to its introduction, was obtained as a result of some prior investigation of another incident unrelated to this particular activity. I am specifically going to instruct you that you are to disregard the fact that the card was obtained as a result of an investigation of any earlier activity. The only concern of this exhibit is only for what it actually represents; and it is not being presented to you in any respect with regard to any prior activity on the part of this defendant. So that you are to disregard any reference of that respect; and you are only to consider

[13] The record does not indicate, nor does the defendant claim, that this remark about a previous "criminal investigation" involving the defendant was induced by the state's examination of this witness.

[14] The defendant has not assigned the denial of his request for a mistrial as a claim of error.

this in the light of what it actually represents as far as the information contained in this document." In addition, the trial court, during its charge to the jury, reaffirmed the obligation of the jury not to consider any excluded evidence or disallowed answers in reaching a verdict. Dissatisfied with the initial curative instruction, the defendant argues that under *State* v. *Ralls,* 167 Conn. 408, 356 A.2d 147 (1974), this instruction was insufficient to dispel the implication that the defendant had a prior "criminal history" and thus was "manifestly" prejudicial.[15] We disagree.

In *State* v. *Ralls,* supra, the testifying police officer, while identifying Ralls' fingerprint card, stated that he had obtained it from " 'a central bureau for all the criminal arrest records in the State of Connecticut.' " Id., 416. Appropriately, the *Ralls* trial court then interrupted the testimony and issued a curative instruction, which essentially attempted to dispel the notion that the card could have originated only from a criminal arrest of the defendant. In contrast, this case presents a much different problem in that the witness had *already* testified that the fingerprints were obtained pursuant to a prior "criminal investigation of the defendant." For the trial court here to have informed the jury, as the defendant desired, that the fingerprints could have been taken for a purpose unrelated to crime would have been, at the very least, anomalous in the face of the testimony already given by the officer. We note that in this case, unlike the factual thrust presented in *Ralls,* there was no direct testimony from this witness that the defendant had previously been

[15] The defendant claims that the admission into evidence of his photographs, state's exhibits T and U, should be considered along with the officer's remark as supporting his claim of prejudice. This claim regarding the photographs was not specifically made to the trial court, which consequently never had the opportunity to consider it in fashioning its curative instruction. We thus decline to review it under *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973) ("a claim not raised is deemed waived" absent "exceptional circumstances").

arrested and the defendant does not claim that the exhibit itself contained any actual evidence of past crimes. Under the circumstances, which included both the immediate curative instruction directing the jury to disregard the origin of the card as well as the final instructions directing the jury not to consider excluded evidence or disallowed questions or answers, we find no merit to this claim.

The defendant next claims that the trial court erred in denying his request to charge the jury that fingerprint evidence standing alone is sufficient for a conviction only if the fingerprints were found under such circumstances that they could only have been impressed at the time of the crime.[16] The trial court, however, charged the jury on this matter that "[f]ingerprint evidence is a consideration for you to rely upon and to support a conviction if the Defendant's fingerprints were found in the place where the crime was committed, in this case, the interior of the car, under such circumstances that they could only have been placed there when the crime was committed." The defendant complains that this portion of the charge failed to instruct the jury that fingerprint evidence is sufficient to support a conviction *only* under such circumstances. The

---

[16] The defendant submitted the following written request to charge on this matter: "[F]ingerprint evidence standing alone is sufficient for a conviction only if the 'fingerprints corresponding to those of the accused were found in the place where the crime was committed [here the car] under such circumstances that they could only have impressed there at the time the crime was committed.' This is particularly true in the case of an automobile, which by its very nature is 'inherently mobile and presents a continuing possibility of being moved,' and is often accessible to the public. 'The fact that the defendant's fingerprints were [inside] of the abandoned vehicle, in and of itself, is of no moment. Unless it can be shown that the circumstances are such that the fingerprints could have been impressed only at the time the crime was perpetrated, the presence of the defendant's fingerprints [inside the car] does not establish his connection with the crime charged.' "

defendant contends that the jury should also have been charged that "[t]his is particularly true in the case of an automobile." See footnote 16, supra.

We have said that "a conviction may not stand on fingerprint evidence alone unless the prints were found under such circumstances that they could have been impressed only at the time the crime was committed. *State* v. *Payne,* 186 Conn. 179, 182, 440 A.2d 280 (1982)." *State* v. *Thorpe,* 188 Conn. 645, 648, 453 A.2d 88 (1982); see *State* v. *Mayell,* 163 Conn. 419, 426, 311 A.2d 60 (1972). Moreover, we have noted that "[g]enerally, when a party submits a request to charge on a specific issue, it is the duty of the court to comply in substance with the request if it is applicable." (Citations omitted.) *State* v. *Annunziato,* 169 Conn. 517, 529, 363 A.2d 1011 (1975). In the present case, however, because the essence of the request was given, any semantical discrepancy between the instruction as given and the rule as stated in both *State* v. *Payne,* supra, and *State* v. *Thorpe,* supra, cannot be considered reversible error. Moreover, as we have summarized above, the fingerprint evidence in this case was not the sole connection of the defendant to the crime. The victim identified the defendant in court, and the testimony as to the proximity of the defendant's residence at the time to the abandoned automobile and Twaroski's personal belongings go far in undermining the factual underpinnings of this claim.

The defendant's final claim is that the trial court erred in denying his request to charge the jury on the dangers of misidentification and the factors to be considered in evaluating the likelihood of misidentification. The defendant submitted to the trial court a detailed seven-part request to charge on identification, totaling in excess of nine hundred words. Instead of giving that, the trial court charged, inter alia, the following: "Now, another important issue in this case is the iden-

tification of the defendant as the perpetrator of the crime alleged here. The State has the burden of proving identity beyond a reasonable doubt. It is not essential that the witnesses themselves be free from doubt as to the correctness of their identification. However, you the jury must be satisfied beyond a reasonable doubt of the accuracy of the identification of an accused before you can convict him. If you're not convinced beyond a reasonable doubt that the accused was the person who committed the offense, then you must find the accused not guilty."

"Although we have indicated that a court should grant a request for a charge regarding the dangers of misidentification in an appropriate case, we have not found reversible error in the failure to do so where 'the conviction of the defendant did not turn upon the testimony of eyewitnesses who were uncertain, unclear or inconsistent.' *State* v. *Harden,* 175 Conn. 315, 322, 398 A.2d 1169 (1978); see *State* v. *Maturo,* 188 Conn. 591, 600, 452 A.2d 642 (1982); *State* v. *Tinsley,* [supra, 393–94]." *State* v. *George,* 194 Conn. 361, 375, 481 A.2d 1068 (1984). In this case, however, not only were the specific instructions correct, but our review indicates that the charge as a whole fairly presented the case to the jury so "that injustice was not done under the law to the legal rights of the defendant." *State* v. *Cooper,* 182 Conn. 207, 211, 438 A.2d 418 (1980); see *State* v. *Harris,* 172 Conn. 223, 226, 374 A.2d 203 (1977). Additionally, with the strong fingerprint evidence linking the defendant to the Twaroski vehicle, the identification of John Manley as the perpetrator in this case "was neither dubious; *State* v. *Tinsley,* supra, 394; nor did it present any special difficulties. *State* v. *Harden,* supra, 322." *State* v. *Maturo,* supra, 600.

There is no error.

In this opinion the other judges concurred.